## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARRETT GRAVES, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-568 (JCH) |
| v. | : | |
| | : | |
| CHUBB & SON, INC., | : | MARCH 31, 2014 |
| Defendant. | : | |

### RULING RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 40) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 43)

**I.    INTRODUCTION**

Plaintiff Garrett Graves brings this action against Chubb & Son, Inc. ("Chubb"), alleging denial of overtime wage payments in violation of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. §§ 201 et seq.; the Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. §§ 31-58 et seq.; and the California Labor Code, Cal. Labor Code §§ 510, 515, 1194.  Graves now moves for summary judgment on two issues:  (1) whether his position was improperly classified as exempt from federal and state overtime pay requirements; and, if so, (2) whether the FLSA's liquidated damages provision applies. Chubb cross-moves for summary judgment on the first issue, which underlies each of the three counts in Graves's Second Amended Complaint.

For the reasons stated below, Graves' Motion (Doc. No. 40) and Chubb's Cross-Motion (Doc. No. 43) are both **DENIED**.

**II.    FACTUAL BACKGROUND**

Chubb is an insurance company that offers a variety of professional and management liability insurance policies, including crime liability, directors and officers liability ("D&O"), fiduciary liability, employment practices liability ("EPLI"), and kidnap and ransom liability ("K&R").    Def.'s Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1")

1

(Doc. No. 43-5) ¶ 1.  Graves was employed at Chubb from December 2006 to December 2010, first as a trainee, then as an Underwriter I from September 2008 onward.  Id. ¶¶ 6, 8.  He worked on site at Chubb's Underwriting Services Branch ("USB") in Simsbury, CT until June 2010, after which, for personal reasons, he worked remotely from California until his termination in December 2010.  Id. ¶¶ 5-6.  At all times relevant to the instant suit, he held the Underwriter I position and did not receive overtime pay.  Pl.'s Local Rule 56(a)1 Statement ("Pl.'s L.R. 56(a)1") (Doc. No. 54) ¶¶ 2-3.

While an Underwriter I, Graves's primary responsibility was underwriting renewals of insurance policies.  Id. ¶ 11.  Initially, he bore responsibility for underwriting only some of Chubb's lines of coverage.  Def.'s L.R. 56(a)1 ¶ 9.  However, with experience, he assumed responsibility for additional lines and, by 2010, underwrote D&O, EPLI, fiduciary, crime, K&R, and miscellaneous professional liability, with three million dollars of authority in some lines and five million dollars in others.  Id. ¶¶ 10, 26.  Up to these limits, Graves was not required to receive additional permission to approve a policy.  For policies beyond these limits, he conducted analyses and made recommendations, which a supervisor or underwriter with greater authority would review before granting approval.  Id. ¶ 29.

Prior to being given such underwriting authority, Graves completed substantial training.  Id. ¶ 19.  The training covered such topics as:  how to read financial statements, id. ¶ 21; in connection with fiduciary policies, how pension plans work and how to detect unfunded pension plan liabilities, id.; in connection with D&O policies, director and officer duties and how to calculate related risk, id. ¶ 20; in connection with

EPLI, tips for preventing employment discrimination claims, id.; and, in connection with K&R, information on current events involving kidnappings, id.

Depending on the type of insured entity and policy sought, Graves used either Chubb Specialty Insurance ("CSI") Express software or a Word document to sort the relevant data.  Pl.'s L.R. 56(a)1 ¶ 15.  He might also use Chubb's Profitability Indicator ("PI") tool, which synthesizes information about the insured's business, the state of the industry, Chubb's loss history with the industry group, the client's overall financial condition, and the customer's claims history in order to produce a one-to-five star profitability score.  Id. ¶ 21; Def.'s L.R. 56(a)1 ¶¶ 62-63.  Yet another key source of guidance to Graves was the CSI playbook, a collection of memoranda and information, including what to look for and consider when underwriting an account.  Pl.'s L.R. 56(a)1 ¶ 33; Def.'s L.R. 56(a)1 ¶¶ 57-58.

The parties vigorously dispute the nature and characterization both of Graves's data entry and of the function played by CSI Express, PI guidance, and the CSI playbook in dictating a policy premium and limiting Graves's authority.[1]  While Chubb admits that CSI Express is a ratings engine, Chubb denies that CSI Express, rather than Graves, evaluated the insured's risk.  Def.'s Local Rule 56(a)2 Statement ("Def.'s L.R. 56(a)2") (Doc. No. 60) ¶ 16.  According to Graves, the result of inputting data into CSI Express was a policy premium.  Pl.'s L.R. 56(a)1 ¶ 19.  Chubb insists, however, that CSI Express depended on underwriters like Graves "to analyze a wide variety of information to be able to input data into the system" in the first place, and that "[o]nly

---

[1] Although both parties moved for summary judgment, Graves himself recognizes that the issue of whether the CSI playbook and Chubb's other guidance provided formulas and rules from which he could not deviate depends on material facts that are disputed in this case.  See Pl.'s Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 56) at 24.

then would the program calculate a guidance premium" to assist the underwriter in setting the final premium.  Def.'s L.R. 56(a)2 ¶ 16.  As support, Chubb cites the affidavit of Edward Piantek, one of Graves's supervisors at Chubb, attesting to the variety of information Graves used in performing an underwriting analysis.  Piantek Aff. ¶¶ 24-32, Ex. C to Def.'s Mem.  Piantek also testified, however, that CSI Express was a ratings engine into which Graves input information.   Piantek Dep. 32:2-8, 113:3-5.

While Chubb admits that underwriters also received PI guidance in pricing an account, it alleges that a PI rating never dictated any action by Graves.  Id. ¶ 24. Graves alleges, however, that his flexibility depended on the PI score.  Pl.'s L.R. 56(a)1 ¶ 30.  Hence, according to Graves, for a five-star account, he could decrease his quote by 15% if the broker or agent asked for such a decrease.  Id. ¶ 31.  Chubb admits that the PI guidance provided for such an optional decrease but denies that Graves's authority to decrease his quote was contingent on the insurance broker or agent's request.  Def.'s L.R. 56(a)2 ¶ 31.

It is undisputed that there was no mandatory premium for an account.  Pl.'s Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 56) ¶ 51.  Graves's underwriting analysis might include assessment of some or all of the following factors:  market or industry trends, id. ¶ 42; regional trends that could affect the insured's wellbeing, id.; previous losses or an insured's claim history, id. ¶ 43; the stability of the insured's board of directors, id. 45; and turnover among employees, id.  Specific lines of coverage could require additional consideration of risk elements unique to that coverage, such as the nature and extent of overseas travel by employees in the case of K&R policies , id. ¶ 47, or diversification of pension plan investments in the case of fiduciary policies, id. ¶ 48.

Chubb's underwriters memorialize all such factors on which the underwriting analysis could potentially be based in Chubb's online underwriting platform, which includes CSI Express.  Id. ¶ 49.  Graves was responsible for entering on this platform information sufficient to reflect the underwriting analysis he undertook with respect to each account.  Id. ¶ 50.

Based on the underwriting analysis, Graves could identify and propose additional lines of coverage of potential interest to the customer.  Id. ¶ 72.  While it is uncontroverted that brokers sometimes requested lower rates, id. ¶ 73, the parties dispute whether Graves "negotiated" lower rates.  According to Chubb, Graves's "role was to engage in such negotiation."  Id.  Graves alleges, however, that he did not negotiate the premium with brokers; rather, if a broker requested a lower premium, and such premium was within his authority and indicated by Chubb's various tools and guidance, he granted the broker's request.  Pl.'s L.R. 56(a)2 ¶ 73.  The parties agree that, after a quote was accepted, Graves was not involved in the subsequent process of converting the quote into a policy.  Pl.'s L.R. 56(a)1 ¶ 14; Def.'s L.R. 56(a)1 ¶ 77.

It is undisputed that Graves did not have specific sales goals, Pl.'s L.R. 56(a)2 ¶ 80; that regular audits of Chubb's underwriters included review of whether underwriters had adequately considered relevant factors in assessing risk, id. ¶ 82; and that underwriters were also evaluated on the timeliness of their customer service, the strength of their broker relationships, and the percentage of policies renewed, id. ¶¶ 83, 86.  Chubb claims to evaluate only the quality, not quantity, of underwriters' work.  Id. ¶ 81.  Graves denies this, citing, as counterevidence, the fact that the first section of his 2009 year-end review evaluated percentage of retention "by policy count for assigned

5

book of business."  Pl.'s L.R. 56(a)2 ¶ 81; Pl.'s Ex. F to Pl.'s Opp'n to Def.'s Mot. for

Summ. J. ("Pl.'s Ex. F") (Doc. No. 55-6) at 2.

## III.    STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law."

O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).

Thus, the role of the district court in deciding a summary judgment motion "is to

determine whether genuine issues of material fact exist for trial, not to make findings of

fact."  Id.  In making this determination, the court must resolve all ambiguities and draw

all inferences in favor of the party against whom summary judgment is sought.  See

Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

The moving party bears the burden of establishing the absence of genuine

issues of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d

Cir. 2010).  Once that initial burden is met, to defeat the motion, the party opposing

summary judgment must set forth "specific facts" that demonstrate the existence of "a

genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed.

R. Civ. P. 56(e)).  For summary judgment purposes, a genuine issue exists where the

evidence is such that a reasonable jury could decide in the non-moving party's favor.

See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir.

2012); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d

Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating

that the non-moving party must point to more than a mere "scintilla" of evidence in its

favor).  "However, reliance upon conclusory statements or mere allegations is not

sufficient to defeat a summary judgment motion." <u>Davis v. New York</u>, 316 F.3d 93, 100 (2d Cir. 2002).

## IV.   DISCUSSION

Graves moves for summary judgment on two issues:  (1) whether the Underwriter I position was improperly classified as exempt under federal and state overtime wage laws; and, if so, (2) whether the FLSA's liquidated damages provision applies.  Chubbs cross-moves only as to the first issue, arguing that the Underwriter I position held by Graves falls within the administrative exemption provided for by the FLSA, CMWA, and California Labor Code alike.

Having reviewed the parties' submissions and the pertinent case law, the court determines that the existence of disputed issues of material fact precludes summary judgment for either party on the first question.  Indeed, the court is puzzled as to how the parties could have imagined, given the record and the multitude of disputed facts, that this case was suitable for summary judgment.  As to the second question, Chubb has offered no evidence demonstrating that it took active steps which could form the basis of a good faith defense to the FLSA's liquidated damages provision.  The court concludes, therefore, that summary judgment for Graves on this issue is appropriate.

### A.   FLSA

The FLSA exempts from its overtime pay requirements individuals "employed in a bona fide . . . administrative capacity."  219 U.S.C. § 213(a)(1).  The CMWA and California Labor Code contain similar exemptions.  See Conn. Gen. Stat. § 31-58(e); Cal. Lab. Code § 515(a); Cal. Code Regs. tit. 8, § 11040(1)(A)(2).  No other exemptions are at issue in this case.

"Because the FLSA is a remedial act, its exemptions are to be narrowly construed, and the burden rests on the employer to prove that a particular employee is exempt from the Act's requirements."  Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citation, alterations, and internal quotation marks omitted); see also Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974) ("[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof.").

The term "administrative," although not defined by statute, is covered by regulations promulgated by the Secretary of Labor pursuant to the FLSA.  See Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 531 (2d Cir. 2009).  Under these regulations, the administrative exemption applies to "any employee:  (1) [c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities; (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

There is no dispute that the first element—the minimum weekly rate of compensation—is met.  See Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") (Doc. No. 43-1) at 16; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") (Doc. No. 55) at 2 (stating that Graves earned a salary of $45,589.29 per year).  Hence, whether the FLSA's administrative exemption covers the Underwriter I position depends on whether the second and third elements are satisfied.  The ultimate question of

whether Graves's job duties excluded him from the FLSA's overtime benefits is a legal one.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  How he spent his days and what his job duties were, however, are questions of fact.  Id.  With respect to the latter, disputed issues of material fact exist in this case that preclude summary judgment as to the ultimate legal question.

      1.    Whether Graves's Primary Duty Was the Performance of Office or Non-Manual Work Directly Related to the Management or General Business Operations of the Employer or the Employer's Customers

There is no dispute that Graves performed "office or non-manual work."  29 C.F.R. § 541.200(a)(2).  To satisfy the primary duty element of the FLSA's administrative exemption, however, Graves's work must have been "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id.

The lead case in this Circuit differentiating administrative and production jobs for FLSA purposes is Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 532 (2d Cir. 2009).  Chubb argues that Davis is inapposite, both because it involved mortgage underwriters, whose work and industry are different from that of the insurance underwriters at issue here, and because it interpreted a pre-2004 section that has since been repealed.  See Def.'s Mem. at 19; Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") (Doc. No. 50) at 4-5.

Both arguments are unavailing.  First, while the instant case may be distinguishable from Davis on its facts, the Circuit's discussion, which includes extensive analysis of related cases and opinion letters by the Department of Labor ("DOL"), remains directly applicable here.  Second, the administrative/production

dichotomy in the pre-2004 section construed by the Circuit in <u>Davis</u> persists in the post-2004 section 541.201(a) at issue here.  Indeed, it is to <u>Davis</u>, among other sources, that this court would naturally look for guidance in instructing a jury as to the primary duty element of the FLSA's administrative exemption.

Under <u>Davis</u>, services provided by underwriters may count as "production" for FLSA purposes in some cases.  The inquiry is a context-specific one.  587 F.3d at 535 ("The context of a job function matters.").  While the line between "production" and "administrative" work is clear in the case of employees on an assembly line or sales personnel in a retail establishment, the line is far less clear where, as here, what is produced is an intangible service rather than a material good.  <u>Id.</u> at 532; <u>see</u> <u>also</u> <u>Harper v. Gov't Employees Ins. Co.</u>, No. CV 09-2254, 2013 WL 5926980, at *7 (E.D.N.Y. Nov. 4, 2013).  According to DOL, the administrative/production distinction is a heuristic device, not an "absolute dichotomy."  <u>Opinion Letter Fair Labor Standards Act (FLSA)</u>, FLSA2010-1, 2010 WL 1822423, at *3 (Cir. Ct. Mar. 24, 2010) (citing <u>Martin v. Indiana Michigan Power Co.</u>, 381 F.3d 574, 582 (6th Cir. 2004)).  Production work is never administrative, but work is not necessarily administrative simply because it does not clearly qualify as production.  <u>Id.</u>  The dichotomy is intended to distinguish work related to the goods and services offered by the business to the marketplace from work directly related to running the business itself.  <u>Id.</u> (citing, <u>inter</u> <u>alia</u>, <u>Davis</u>).  Only the latter work is administrative.

Applying <u>Davis</u> to the instant case, the monetary value of the insurance policies issued by Graves, his title and salary, and his physical work environment are all irrelevant.  587 F.3d at 533.  What matters is the nature of his duties.  <u>Id.</u>  Of especial

10

importance in this regard is the industry in which he worked.  Id. at 536-37; Harper,

2013 WL 5926920 at *8 ("Perhaps most important to note is that both Davis, and the

relevant DOL regulations emphasize the industry-specific nature of the

production/administrative dichotomy question.").

The Davis decision outlines other pertinent general factors:  (1) whether Graves's

work was primarily functional rather than conceptual; (2) whether his work was at the

heart of Chubb's business operations; (3) whether he was involved in determining

Chubb's future strategy or direction; and (4) whether he performed other functions

related to Chubb's overall efficiency or mode of operation.  587 F.3d at 535.  "The

essence of an administrative job is that an administrative employee participates in the

running of a business, and not merely the day-to-day carrying out of its affairs."  Id.

(citation, alteration, and internal quotation marks omitted).

In the context of the financial services industry, DOL regulations provide:

> Employees in the financial services industry generally meet the duties
> requirements for the administrative exemption if their duties include work
> such as collecting and analyzing information regarding the customer's
> income, assets, investments or debts; determining which financial
> products best meet the customer's needs and financial circumstances;
> advising the customer regarding the advantages and disadvantages of
> different financial products; and marketing, servicing or promoting the
> employer's financial products. However, an employee whose primary duty
> is selling financial products does not qualify for the administrative
> exemption.

29 C.F.R. § 541.203.

Interpreting that regulation in light of related DOL opinion letters, the Davis Court

held Chase's mortgage loan underwriters to be non-exempt because they merely

produced the loans sold by the company.  587 F.3d at 535.  There, the underwriters

applied detailed guidance to yield yes or no decisions on the loans, and their

performance was evaluated quantitatively as well as in terms of compliance with the employer's guidance standards.  Id. at 534.

No clear picture of Graves's primary duty emerges from the present record. Thus, summary judgment for either party is inappropriate with respect to the primary duty element.

Chubb's insurance underwriters outwardly differ in at least some respects from the mortgage underwriters in Davis.  There, Chase informally categorized its underwriters as "operations" or "production," and underwriters were not expected to advise customers as to which loan products best met their needs.  Id. In contrast, Chubb does not refer to its underwriters as "production."  Def.'s Mem. at 20.  Graves also handled multiple types of policies, Pl.'s L.R. 56(a)2 ¶ 10; could propose additional lines of coverage to customers, id. ¶ 72; and had authority to lower prices on at least some accounts, id. ¶ 73.  Such differences, however, are not necessarily determinative. Indeed, in Davis, the Circuit cited, as persuasive authority, Martin v. Cooper Electric Supply Co., 940 F.2d 896 (3d Cir. 1991), in which salespersons who were given a pricing matrix specifying quotes for various products were held to be non-exempt production employees, despite having some authority to deviate from the quotes.  587 F.3d at 536 (discussing Martin).

Moreover, in the present case, several disputed issues of material fact exist on which a jury could reasonably find for either party.  To take just two examples, according to Chubb, Graves was not evaluated quantitatively and had extensive contact with customers, with whom he actively negotiated pricing.  See Def.'s Opp'n at 6-9. Graves disputes both factual allegations.  See Pl.'s Opp'n at 7-11.  And there is

conflicting evidence in the record.  With respect to the issue of quantitative assessment, Graves's 2009 year-end review shows that his performance was evaluated not only on the strength of his relationships with brokers but also by the percentage of policies renewed.  Pl.'s Ex. F.  Graves testified that renewing all policies was his goal and that failing to do so would reflect poorly on him.  Graves Dep., 70:13-16.  With respect to his authority to negotiate prices, Graves testified that his authority to depart below a given quote was premised on PI guidance and that, if a broker's request was within his authority to grant, he did so in order to retain the account.  Id., 69:16-70:12.  In contrast, Piantek attests that Graves's role was precisely to negotiate premiums in response to brokers' requests.  Piantek Aff. ¶ 43, Ex. C to Def.'s Mem.

The present record largely consists of such affidavits and deposition testimony, whose weight and credibility it is not for the court to determine at the summary judgment stage.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict."); Kaytor v. Elec. Boat Corp., 609 F.3d 537, 550 (2d Cir. 2010) ("[T]he weighing of the evidence is a matter for the factfinder at trial, not for a court considering a motion for summary judgment.").  While Chubb will bear, at trial, the burden of proving all elements of the administrative exemption, Havey, 547 F.3d at 163, each party has presented evidence sufficient, at

this stage, to preclude summary judgment for the opposing party on the primary duty element.[2]

> 2.    Whether Graves's Primary Duty Included the Exercise of Discretion and Independent Judgment

The last element of the administrative exemption is "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  The DOL regulation defining this element offers a non-exhaustive list of relevant considerations:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances

29 C.F.R. § 541.202(b).

As the Second Circuit has explained, "[t]he exercise of discretion and independent judgment 'implies that the employee has authority to make an independent choice, free from immediate direction or supervision,' though decisions or

---

[2] Chubb argues, in the alternative, that it is entitled to summary judgment on the primary duty element because Graves was servicing the business of Chubb's customers.  See Def.'s Mem. at 22-23. The factual basis for this argument is disputed, however, and the sole evidence cited by Chubb—namely, Graves's testimony regarding whether, in cases where he had authority to do so, he would lower his price in response to a broker's request and, if so, by how much, see Graves's Dep. 70-71—does not clearly support Chubb's claim.

recommendations that are 'reviewed at a higher level,' may still be considered sufficiently discretionary to satisfy the duties test." Coleman-Edwards v. Simpson, 330 F. App'x 218, 220 (2d Cir. 2009) (quoting 29 C.F.R. § 541.202(c)).

Whether Graves exercised discretion and independent judgment with respect to matters of significance turns on disputed issues of material fact, as to which a jury could reasonably find for either party.  It is undisputed that Graves did not need additional permission to approve a policy up to certain limits and that, beyond those limits, he made recommendations to a supervisor or underwriter with greater authority.  However, such facts are not wholly determinative.

Of critical importance, in the court's view, is the extent of direction provided by Chubb's various underwriting tools:  CSI Express, PI guidance, and the CSI playbook. There are competing accounts and ambiguous evidence as to this issue.  Chubb portrays such tools as mere resources, claiming that Graves had discretion to analyze and price risk differently based on his independent judgment.  Def.'s Mem. at 24-25. As support, Chubb adduces instances in which Graves's underwriting analyses reach conclusions not dictated by or contrary to the PI tool or the CSI Express guidance premium.  Def.'s Mem. at 25-26.  Yet, with respect to at least some of these instances, Graves testified that, in pricing a given account differently, he would have sought a senior underwriter's advice or followed directions from the CSI playbook as to handling that particular situation.  Pl.'s Opp'n at 17-19.

A reasonable jury could credit and weigh this evidence and draw appropriate inferences to find for either party.  It is not the court's job to do so at the summary judgment stage.  Anderson, 477 U.S. at 255; Kaytor, 609 F.3d at 550.  The existence of

15

disputed issues of material fact suffices to preclude summary judgment on this third element, as on the second element.  Both elements—whether Graves's primary duty directly related to running Chubb's business and whether it included the exercise of discretion and independent judgment—are determinations which must, on the present record, be left to the finder of fact at trial.

>           3.       Whether Liquidated Damages Apply

The FLSA provides that an employer who violates the law's overtime pay requirement shall be liable to the employee for liquidated damages in an additional amount equal to his unpaid overtime compensation.  29 U.S.C. § 216(b).  "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA."  Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999).  However, "[c]ourts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective good faith and had objectively reasonable grounds for believing that the acts or omissions giving rise to the failure did not violate the FLSA." Id.  "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them."  Id.

Graves moves for summary judgment on the applicability of liquidated damages based on the absence of any evidence of good faith in the record.  Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. (Doc. No. 41) at 23-25.  The only witness Chubb identified with knowledge of the classification process, Leeanne Siana, testified that she did not, in fact, know whether Chubb conducted an FLSA analysis before classifying the Underwriter I position as exempt.  Id. at 23.  While Chubb did not designate Siana as a

Rule 30(b)(6) representative in response to a properly framed request for someone with knowledge as to the company's actions regarding FLSA classification, see Def.'s Opp'n at 16 n.7, Chubb has not brought forward any evidence at this stage to raise a material factual dispute as to whether it could meet the standard set forth in Herman of "subjective good faith" and "objectively reasonable grounds," 172 F.3d at 142. As putative signs of good faith, Chubb cites only industry-wide practices and Siana's testimony that, although she was not personally involved in an FLSA analysis of the Underwriter I position, she imagines that one took place. Def.'s Opp'n at 16-17. Custom and speculation do not demonstrate Chubb's having undertaken "active steps" to ascertain and comply with the dictates of the FLSA and are plainly insufficient to permit a reasonable jury to find for Chubb on the issue of good faith.

Hence, the court determines, as a matter of law, that liquidated damages apply. To the extent Chubb is liable to Graves for unpaid overtime wages, it will be liable for liquidated damages in an additional amount equal to such wages.[3]

B.    CMWA and California Labor Code

The tests for the administrative exemption under Connecticut and California state law are similar to those under the FLSA. See Hendricks v. J.P. Morgan Chase Bank, N.A., 677 F. Supp. 2d 544, 560 (D. Conn. 2009); Campanelli v. Hershey Co., 765 F. Supp. 2d 1185, 1189 n.10 (N.D. Cal. 2011). However, additional criteria must also be met. In both Connecticut and California, to fall within the state's administrative

---

[3] Chubb argues that a decision regarding liquidated damages is premature in the absence of a finding as to liability. The purpose of summary judgment, however, is precisely to narrow the issues for trial, and Rule 56 contemplates that parties may move for partial summary judgment as to non-dispositive issues. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); Jewell-Rung Agency, Inc. v. Haddad Org., Ltd., 814 F. Supp. 337, 339 (S.D.N.Y. 1993) (citing cases granting partial summary judgment as to damages while leaving issues of liability for trial).

exemption, the employee must "perform[ ] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge." Conn. Agency Regs. § 31-60- 15(a)(3)(B); Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(d). In addition, both states consider the time spent by the employee on exempt versus non-exempt work.  Conn. Agency Regs. § 31-60- 15(a)(4); Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(f).  Finally, in California, the employee must also be paid twice the state's minimum wage.  Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(g).  Chubb bears the burden of proving each element of the administrative exemption, including the added state law elements.  See Havey, 547 F.3d at 163; Butler v. Hartford Technical Inst., Inc., 243 Conn. 454, 466 (1997); Rieve v. Coventry Health Care, Inc., 870 F. Supp. 2d 856, 876 (C.D. Cal. 2012).

While both parties move for summary judgment on liability under the CMWA and the California Labor Code, they have barely briefed the extra state law elements.  The court considers summary judgment improper for that reason alone.   Moreover, the only such element addressed by either party—namely, the percentage of time that Graves spent on exempt versus non-exempt work, see Def.'s Mem. at 27—necessitates a prior determination as to which work is exempt, which determination the court has held to depend on material facts in dispute, see Sections IV.A.1 & 2, supra.

Hence, absent briefing by the parties, and given the overlap between the state law analysis and the FLSA analysis, the latter of which turns upon disputed issues of material fact, summary judgment is inappropriate for either party on liability under the CMWA and the California Labor Code.

**V.      CONCLUSION**

For the reasons set forth above, the court **DENIES** Chubb's Cross-Motion for Summary Judgment (Doc. No. 43) and **GRANTS in part and DENIES in part** Graves's Motion for Partial Summary Judgment (Doc. No. 40). Graves's Motion is **granted** as to liquidated damages and is otherwise **denied**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of March, 2014.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge