## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GARRETT GRAVES,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.:** |
| | : | **3:12-CV-00568 (JCH)** |
| **v.** | : | |
| | : | |
| **CHUBB & SON, INC.,** | : | **MAY 14, 2015** |
| **A Division of Federal Insurance** | : | |
| **Company,** | : | |
| **Defendant** | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff, Garrett Graves, by and through his undersigned counsel, hereby submits his Memorandum of Law in Support of his Motion for Judgment as a matter of law. The evidence presented in this case show that Plaintiff's primary duty did not relate directly to the "management or general business operations" of Defendant or Defendant's customers as required by the administrative exemption to the overtime provisions of the Fair Labor Standards Act. 29 C.F.R. § 541.200. Rather, Plaintiff performed production functions aimed directly at producing Defendant's "goods": up-to-date insurance policies. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). Specifically, the testimony and evidence in this case show that Plaintiff's primary duties were three-fold: customer service, sales and underwriting policies to issue price quotes. Plaintiff's duties did not involve formulating Defendant's policies or charting its overall course; he merely applied the detailed and extensive rules provided to him as directed by Defendant in order to produce as many policy renewals as possible.

In addition, the Court should enter Judgment as a matter of law that Defendant's actions were willful. The only evidence in this case is that Defendant knew it was subject to the FLSA and knew what Mr. Graves' duties were, but failed to take any steps to ensure that he was

1

properly classified as exempt, thus exhibiting conscious disregard for whether or not he was properly classified as exempt.

## I.     FACTS

### A.   Mr. Graves's Employment with Defendant

Mr. Graves was hired by Defendant for a position in its Underwriting Services Branch ("USB") in Simsbury, Connecticut, on or around December 1, 2006.  (Exhibit 1; Testimony of Garrett Graves; Testimony of Edward Piantek.)  He initially was paid a salary of $1,750 semi-monthly, or $42,000 per year.  (Exhibit 1; Testimony of Garrett Graves).  He received a raise, such that by April, 2009 he was earning $1,900.36 semi-monthly.  Testimony of Garrett Graves; Exhibit 22).  Effective April 1, 2010, he received a raise to $1,957.29 semi-monthly. (Testimony of Garrett Graves; Exhibit 22).

Prior to May, 2008, when he worked more than 40 hours in a week, he was paid overtime compensation.  (Testimony of Garrett Graves).  His overtime compensation was calculated by dividing his weekly salary by 40 and paying him time-and-a-half for all hours over 40.  (*Id.*).  In May of 2008, Defendant unilaterally converted him to an exempt position, so that he no longer received overtime compensation.  (*Id.*; Exhibit 20).

Mr. Graves worked as an "Underwriter I" for the entire period of this claim.  (Testimony of Garrett Graves; Testimony of Edward Piantek).  The nature of Mr. Graves' duties was the same in 2008, 2009 and 2010 (Testimony of Edward Piantek).

In late May 2010, Plaintiff moved to California and began working remotely using telecommuting technology.  (*Id.*).  His employment was terminated in December 2010.  (*Id.*).

### B.   Mr. Graves's Job Duties

As a renewal Underwriter I, Mr. Graves was primarily responsible for renewing existing

insurance policies.  (Testimony of Garrett Graves; testimony of Edward Piantek.).

In order to renew a policy, Mr. Graves would first receive a renewal application from an insurance agent or broker with the insured's information.  (Testimony of Garrett Graves; testimony of Edward Piantek).  This information typically consisted of financial audits, the number of employees, whether there were appropriate checks in place for employees who handled company money, etc.  (*Id.*).  Once he received the information, he would enter it into Chubb's computer system.  (*Id.*)  Depending on the type of entity and the type of policy sought by the insured, he would use either an underwriting software program called "CSI [Chubb Specialty Insurance] Express" or a Word document that would allow him to sort the insured's relevant data.  (Testimony of Edward Piantek).  Mr. Graves would fill in the fields of the CSI Express program with information contained on the insured's application, though some of the information would already be in the system from the previous year's application.  (Testimony of Garrett Graves; testimony of Edward Piantek).  If any information needed by the CSI Express program were missing from the application, he would ask the agent or broker for the information so that he could complete the form.  (*Id.*)  The result of entering data into the CSI Express system was a premium for the policy sought by the insured.  (*Id.*)   Mr. Graves also might use Defendant's "Profitability Indicator" tool (Exhibit 9), which would tell Mr. Graves how Defendant rated the insured's profitability based on the nature of the company's business, how their industry had been doing, how their financial condition may have been, and other factors. (Testimony of Garrett Graves; Testimony of Edward Piantek).  Based on the Profitability Indicator score, he would have more or less flexibility to lower the premium in order to keep the account.  (Testimony of Garrett Graves; testimony of Edward Piantek).  For an account that was very profitable- a "five star" account per the Profitability Indicator- Mr. Graves could decrease

3

his quote for the insured's premium by 15% if asked by the broker or agent.  (Exhibit 9;

testimony of Edward Piantek).

Mr. Graves made use of Chubb's detailed guidelines to determine whether he had

authority to submit a quote for an insured's policy to a broker or agent.  (Testimony of Garrett

Graves; testimony of Edward Piantek; Exhibit 65).  When Mr. Graves needed to obtain this

authorization, he would either email a supervisor or call or meet with a supervisor in person.

(Testimony of Garrett Graves; testimony of Edward Piantek).

Mr. Graves's performance reviews for the period of this claim demonstrate his duties and

the aspects of his job most important to Defendant.  His year end performance review for the

year 2009 (Exhibit 14) shows that he was evaluated on the following four areas: process

management, quality, teamwork, and "financial."  These areas were weighted 40%, 20%, 20%,

and 20%, respectively.

Mr. Graves's performance review in the "financial" area examined how many policies he

was able to retain for Defendant; that is, how many insureds accepted the quotes generated by

Mr. Graves using Defendant's computer systems and metrics and what percentage of the

premiums paid by the accounts he held were still being paid.  For example, at the end of 2009,

Mr. Graves's supervisor at that time, Connie Tosto, noted that

> In 2009 Garrett worked with the DTO ["downtown," New York City] and
> NJR [New Jersey] branches.   His retentions were within the USB
> [Underwriting Services Branch] goals.   DTO policy % was 86% Garrett
> maintained 91% premium retention and 92% policy retention.  NJR policy
> % was 88% Garrett maintained 86% premium retention and 84% policy
> retention which was slightly below the USB goal.  Although NJR numbers
> are slightly below USB goals they were well beyond branch %'s Garrett up
> sold 21 policies for a premium total of $56,572.

Exhibit 14 at GRAVES000342.

"Book management," the next area in which Mr. Graves was evaluated, examined the

4

process by which Mr. Graves went about renewing insurance policies.  (*Id.*)  In the subsection

entitled "goal," this document explains that Mr. Graves was expected to follow Defendant's

policy of reviewing or "touching" each account at least 30 days prior to the expiration of

insurance policies.  (*Id.*)  Doing so allowed Mr. Graves to determine what information he needed

to obtain to underwrite each policy to ensure that he could enter all of the necessary information

into the underwriting forms prior to the policy's expiration date.  (*Id.*)  In this way coverage

would not lapse and premiums would continue to be paid to Defendant.  Ms. Tosto remarked of

Mr. Graves's performance:

> Garrett maintained the USB metrics workflow.  Garrett sent out incomplete
> letters and/or emails requesting information 60 days prior to need by dates
> Garrett always followed underwriting guidelines by checking claim activity
> prior to underwriting accounts.  Garrett sent second and sometime[s] third
> request[s] for the necessary renewal information and keep in contact with
> agents concerning all renewals Garrett maintained the USB guid[]ance of
> "Touched" 30 days prior to expiration Garrett completes all checklist, CSI
> Express analysis or other appropriate underwriting analysis and obtains all
> necessary sign off authority for account[s] outside of his authority Garrett
> submits all binder requests within 24 hou[rs] of receipt to the correct email
> or through Automation Process for those accounts that fall within the
> guidelines …Garrett manages his book to ensure all agents with outstanding
> accounts have been contacted and premium booked in the appropriate
> month …

Exhibit 14 at GRAVES000342-43.

Thus Mr. Graves was responsible for collecting the information necessary from insureds

before their policies lapsed.  He would then enter the information into CSI Express or another

underwriting analysis document and obtain approval for the resulting quote if necessary.

The next area in which Mr. Graves was evaluated was "underwriting quality."  (Exhibit

14, at GRAVES000343.)  This subsection of his performance evaluation measured how he

complied with Defendant's rules and guidelines and his "proficiency in contract language,

coverage issues, and product underwriting strategies."  *Id*.  Ms. Tosto remarked that, among

other things, Mr. Graves had a good understanding of the rules for underwriting New York

policies and that he obtained authority from an Executive Underwriter when he disagreed with a

Profitability Indicator calculation.  *Id.*

Finally, Mr. Graves was evaluated with respect to how well he worked with others in the

organization.  *Id.* at GRAVES000343-44.  This section of his performance review noted that he

had maintained good relations with the agents from whom he gathered the information necessary

to renew policies and that others felt comfortable asking him for help.  *Id.*

On page GRAVES000346-47, Ms. Tosto provided her "overall comments" regarding Mr.

Graves's 2009 performance.   She noted that he was able to retain a high number of policies for

Defendant and that he followed Defendant's rules in so doing:

> In 2009 Garrett worked with the DTO and NJR branches.  His retentions
> were within the USB goals.  Garrett upsold 21 policies for a premium total
> of $56,572.  Garrett maintained the USB metrics workflow by sending out
> incomplete [letters] and/or emails requesting information, quoting account
> by the need by dates, or quoting account 30 days out[.]  Garrett also follows
> USB Metric Guidelines by sending all binder, endorsement request and
> BOR to the correct email boxes within the allowed USB time tables….

*Id.*

### C.  Chubb's Classification of Garrett Graves as Exempt

When he was first hired, Mr. Graves was non-exempt, and thus received overtime

compensation when he worked more than 40 hours in a week.  (Testimony of Garrett Graves;

testimony of Lee Ann Sherman).  In September 2008, however, he was moved to a non-exempt

position.  (Testimony of Lee Ann Sherman).

At no time during Mr. Graves' employment did Defendant ever review whether the

position of Underwriter I, Mr. Graves' position, was properly classified as exempt.  (Testimony

of Lee Ann Siana).  Defendant knew Mr. Graves' duties.  (Testimony of Edward Piantek;

testimony of Lee Ann Siana).  Defendant also knew that Mr. Graves was working overtime.

(Exhibit 14; Exhibit 15; Exhibit 19; testimony of Garrett Graves; testimony of Edward Piantek).

While Defendant has a process for doing an exemption review, that process was never applied to

Mr. Graves' position.  (Testimony of Lee Ann Siana).

## II.     LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW

The standard for granting a motion for judgment as a matter of law mirrors the standard

for deciding a motion for summary judgment.  "[T]he same standard that applies to a pretrial

motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for

judgment as a matter of law during or after trial pursuant to Rule 50."  *Kerman v. City of New*

*York*, 374 F.3d 93, 110 (2d Cir. N.Y. 2004).  As explained by the Second Circuit:

> The standard governing motions for judgment as a matter of law ("JMOL")
> pursuant to Rule 50, formerly denominated motions for directed verdict or
> motions for judgment notwithstanding the verdict is well established. Judgment
> as a matter of law may not properly be granted under Rule 50 unless the evidence,
> viewed in the light most favorable to the opposing party, is insufficient to permit a
> reasonable juror to find in her favor. In deciding such a motion, the court must
> give deference to all credibility determinations and reasonable inferences of the
> jury, and it may not itself weigh the credibility of witnesses or consider the weight
> of the evidence. Thus, judgment as a matter of law should not be granted unless
> (1) there is such a complete absence of evidence supporting the verdict that the
> jury's findings could only have been the result of sheer surmise and conjecture, or
> (2) there is such an overwhelming amount of evidence in favor of the movant that
> reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Galdieri-Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir. 1997) (citations

omitted).

In deciding a Rule 50 motion, the Court "must view the evidence in the light most

favorable to the non-movant, deferring to the jury's assessment of the evidence and all

reasonable inferences the jurors could draw from that evidence."  *Meloff v. New York Life Ins.*

*Co.*, 240 F.3d 138, 145 (2d Cir. 2001).  Judgment as a matter of law is "proper only if the

evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir. 1986) (internal quotation omitted).

### III.     LEGAL PRINCIPLES

### A.       The FLSA

Because the Fair Labor Standards Act ("FLSA") is a remedial act, its exemptions are to be narrowly construed.  *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960); *Mitchell v. Lublin, McGaughty & Assoc.*, 358 U.S. 207, 211 (1959).  In addition, an employer bears the burden of proving that its employees fall within an exempted category of the Act.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *Arnold*, 361 U.S. at 392; *Donovan v. Carl's Drug Co., Inc.*, 703 F.2d 650, 652 (2d Cir.1983).  Thus a Defendant must prove that an exemption "clearly and unmistakably" applies in order to win a motion for summary judgment.  *See Arnold, supra*, 361 U.S. at 392; *Nickell v. City of Lawrence, Kan.*, 352 F. Supp. 2d 1147 (D. Kan. 2004) (in order to qualify as exempt executives as a matter of law, employer must show that employees "plainly and unmistakably" fall within exemption).

### B.       The Administrative Exemption

#### 1.    The Administrative Exemption to the FLSA

An employee who is exempt under the administrative exemption must have as his primary duty "the performance of work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. §541.201 (a). Further, his or her primary duty "must include the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. 541.202 (a).  There is an important distinction between

8

work that involves the "production" of the employer's products, and the administration of the business itself.  *See, e.g., Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009); 29 C.F.R. § 541.205(a).

### C.    Willfulness

In order for the Plaintiff to establish that the Defendant's failure to pay him overtime was willful, he must prove, by a preponderance of the evidence that the Defendant knew that its conduct was prohibited by the FLSA or showed reckless disregard for whether its conduct was prohibited by FLSA.  *McLaughlin v. Richland Shoe* Co., 486 U.S. 128, 133 (1988).  "Reckless disregard" is "the failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]." 5 C.F.R. § 551.104.  Among the factors to be considered in determining whether Defendant showed reckless disregard for whether its conduct was prohibited by the FLSA are: whether it knew it was subject to the FLSA; whether it took any steps to determine the lawfulness of deeming Mr. Graves an exempt employee; whether or not Defendant consulted with its attorneys or the Department of Labor; and whether it knew that Mr. Graves was working more than 40 hours a week.  *See Brock v. Wilamowsky*, 833 F.2d 11, 18-19 (2d Cir. 1987).

### IV.    Discussion

### A.  Mr. Graves's Primary Duty Was Not the "Performance of Work Directly Related to the Management or General Business Operations of the Employer or the Employer's Customers."

The FLSA requires that the employer show that the employee in question's primary duty was "the performance of work directly related to the management or general business operations of the employer or the employer's customers."  Defendant did not make this showing.  The evidence shows both that Mr. Graves did not perform the type of duties envisioned by the Code of Federal Regulations as administrative duties, that he was in fact a production worker.

1.   <u>Mr. Graves did not carry out administrative duties as envisioned by the code of federal regulations.</u>

29 C.F.R. § 541.201 (b) sets out a list of examples of "work directly related to management or general business operations."  While this is a non-exhaustive list, it provides important guidance as to the type of work that Congress intended the exemption to cover.  The regulation lists:

> tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id*.  These are all "duties clearly related to servicing the business itself: it could not function properly without employees to maintain it; a business must pay its taxes and keep up its insurance. Such are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function."  *Neary v. Metropolitan Property and Cas. Ins. Co.*, 517 F. Supp. 2d 606, 614 (D. Conn. 2007).

It is uncontested that Mr. Graves did not carry out any of the duties in the aforementioned list.  Both Mr. Graves and Mr. Piantek testified that Mr. Graves did not do any accounting for Defendant, nor did he have anything to do with Defendant's budgeting; insurance; purchasing; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet, and database administration; or legal and regulatory compliance.

Instead, Mr. Graves's primary duty was the day-to-day task of renewing insurance policies.  As was set forth in detail above, his job primarily consisted of entering data from an application into a computer program, looking at Defendant's guidelines to determine what his

10

options were for renewing the policy based on what the computer programs told him, seeking approval from supervisors if the renewal went beyond his authority, and communicating the terms of the renewal to the department that would convert a quote into a policy.  He also assisted agents and brokers with questions regarding the renewal of policies.

      This work is simply not "related to the management or general business operations" of Defendant's business.  He did not make any policy determinations for Defendant.  *See, e.g., Bratt v. County of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir. 1990).  He was not involved in drafting the insurance policies for Defendant; this work is performed by product managers.  (Testimony of Edward Piantek)  He did not draft, or have any role in drafting, any of the policies or guidelines contained in the "CSI playbook"- he merely carried out these rules.  (*Id.*).  *Relyea v. Carman, Callahan, & Ingham, LLC*, 2006 WL 2577829 at *5 (E.D.N.Y. Sept. 6, 2006) ("Plaintiffs applied existing policies and procedures on a case-by-case basis.  Their duties do not involve the crafting of those policies, but rather the application of those policies.")  He did not perform any work that was "applicable to the running of any business."  *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 534 (2d Cir. 2009).  Instead, as Mr. Piantek testified, his primary duties were customer service, sale of Defendant's product, its insurance policies, and underwriting in order to issue price quotes, thereby ensuring that premiums continued to be paid to Defendant.  This routine, repetitive work constituted the day-to-day revenue-generating operations of Defendant, and thus is not work "directly related to the management or general business operations of the employer or the employer's customers."

      For this reason, Defendant did not meet its burden to prove that Mr. Graves satisfies the essential first prong of the administrative exemption, and thus this Motion should be granted.

2.   Mr. Graves's work is properly characterized as production, and not as administrative, work.

The "administrative/production dichotomy" is a term used by courts to separate the administrative work performed by the employees who run the business itself from the production work that is performed by the employees who make the company's product.  The dichotomy analysis is helpful in applying the administrative exemption in a changing economy in which production work can be performed by employees who did not necessarily physically work on a factory floor.  *See, e.g., Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009).  In *Davis*, the Second Circuit explained that when the company's product was a loan, production employees could well be performing work at desks and on computers.  *Id.* at 532-33.  The Court provided the following guidance regarding the distinction between administrative and production employees:

> Notably, the border between administrative and production work does not track the level of responsibility, importance, or skill needed to perform a particular job…What determines whether an underwriter performed production or administrative functions is the nature of her duties, not the physical conditions of her employment.

*Id.*  Courts in this district have also made the distinction between employees who "carry out the daily affairs of the business" – production workers- and those who engage in "administratively running the business"- administrative workers.  *Neary v. Metropolitan Property and Cas. Ins. Co.*, 517 F. Supp. 2d 606, 614 (D. Conn. 2007).  *See also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) ("The administration/production distinction thus distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself.") (internal quotations omitted); *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 677 F. Supp. 2d 544, 558 (D. Conn. 2009) ("The Second Circuit determined that the bank underwriters in *Davis* fell on the 'production' side of the aforementioned 'dichotomy,' because those underwriters were the workers who

12

produce the services-loans-that are 'sold' by the business to produce its income. In this case, similarly, Hendricks and Minzie worked in a business where the 'product' that JPMorgan sold to clients was fund accounting services.") (internal quotation omitted); *Colyer v. SSC Disability Services, LLC*, 2012 WL 882500 at *9 (S.D. Fla. 2012) ("It appears that to the extent Colyer made determinations about whether to proceed with an application or not, it amounted to a 'yes or no decision,' rather than providing advice as to which product might suit SSC's clients' needs. The administrative/production dichotomy therefore appears potentially appropriate in Colyer's situation. The Court agrees this further disfavors an exemption in Colyer's case.").

The evidence in this case is uniform and undisputed, and shows that the work performed by Mr. Graves was, in fact, very similar to that performed by the plaintiff loan underwriters in *Davis, supra*. In that case, the plaintiffs were "underwriters tasked with approving loans, in accordance with detailed guidelines provided by their employer." *Id.*, 587 F.3d at 530. Specifically, these underwriters

> Evaluated whether to issue loans to individual loan applicants by referring to a detailed set of guidelines, known as the Credit Guide, provided to him by Chase. The Credit Guide specified how underwriters should determine loan applicant characteristics such as qualifying income and credit history, and instructed underwriters to compare such data with criteria, also set out in the Credit Guide, prescribing what qualified a loan applicant for a particular loan product. Chase also provided supplemental guidelines and product guidelines with information specific to individual loan products. An underwriter was expected to evaluate each loan application under the Credit Guide and approve the loan if it met the Guide's standards. If a loan did not meet the Guide's standards, certain underwriters had some ability to make exceptions or variances to implement appropriate compensating factors.

*Id.* at 530-31. As was detailed at length in the testimony of both Mr. Graves and Mr. Piantek, Mr. Graves's duties were remarkably similar. He received an application for renewal of an insurance policy and used various guidelines to evaluate the applicant's financial strength and other relevant data. A comprehensive document entitled the "Executive Protection U.S. Play

Book" (also referred to as the "CSI playbook") (Exhibit 65) provided Mr. Graves with detailed guidance for underwriting each type of insurance.  *See, e.g.,* p. 5 (Commercial Crime Matrix).

The Second Circuit determined that an underwriter performing these duties is properly classified as a non-exempt production worker instead of an exempt administrative employee.  In so holding, the court distinguished between employees who carry out "more substantial advisory duties" from underwriters such as Mr. Graves who are engaged in "day-to-day sales activities."  *Davis, supra*, 587 F.3d at 534.  *See also Colyer, supra*, 2012 WL 882500 at *7 ("Nowhere in the undisputed facts, however, is it shown that Colyer was similarly *advising* clients on selecting between hundreds of different possible options....').   The *Davis* court reasoned that "[u]nderwriters were given a loan application and followed procedures specified in the Credit Guide in order to produce a yes or no decision.  Their work is not related either to setting 'management policies' nor to 'general business operations' such as human resources or advertising,…but rather concerns the 'production' of loans- the fundamental service provided by the bank."  *Id*.  Mr. Graves's case may be summed up by substituting "policy renewal application" for "loan application" and "CSI playbook" for "Credit Guide."

Further, just as the employer in *Davis* consistently referred to the end result of the plaintiffs' work as a "product," so too did Defendant.  *Davis, supra*, 587 F.3d 534.  Mr. Piantek testified that Defendant's insurance policies constitute its products.  Thus Defendant itself considers the result of Mr. Graves's work a product- he is directly responsible for generating this product.

Mr. Graves's performance evaluations measure his output in numeric terms, just like the plaintiffs in *Davis*.  In 2009, Mr. Graves's supervisor described his performance in terms of the percentage of policies that were renewed and the percentage of his premiums that was

maintained.  (*See* Exhibit 13.)  In *Davis*, the Second Circuit found this method of evaluation

persuasive: '[u]nderwriters were evaluated not by whether loans they approved were paid back,

but by measuring each underwriter's productivity in terms of 'average of total actions per day'

and by assessing whether the underwriters' decisions met the Chase credit guide standards."

*Davis, supra*, 587 F.3d at 534.  Mr. Graves's performance evaluations show that he was

measured in precisely the same way: by the percentages referenced above, and by his compliance

with Defendant's underwriting guidelines (see Exhibit 13, page CHUBB/GRAVES 000050

("Garrett always followed underwriting guidelines by checking claim activity prior to

underwriting accounts.  Garrett sent second and sometime[s] third request[s] for the necessary

renewal information and keep[s] in contact with agents concerning all renewals[.]…Garrett

completes all checklist[s], CSI Express analysis or other appropriate underwriting analysis and

obtains all necessary sign off authority for account[s] outside of his authority.")

  The *Davis* court concluded that the underwriters in question were production workers

because they:

> …performed work that was primarily functional rather than conceptual.  They were
> not at the heart of the company's business operations.  They had no involvement in
> determining the future strategy or direction of the business, nor did they perform
> any other function that in any way related to the business's overall efficiency or
> mode of operation.  It is undisputed that underwriters played no role in the
> establishment of Chase's credit policy.  Rather, they were trained only to apply the
> credit policy as they found it, as it was articulated to them through the detailed
> Credit Guide.

*Davis, supra*, 587 F.3d at 535.

  Just as in *Davis*, it is undisputed that Mr. Graves had absolutely no role in formulating

any policies or Defendant's "mode of operations."  (Testimony of Garrett Graves; testimony of

Edward Piantek)  As is shown in his performance evaluation and in the testimony of his

supervisor, Mr. Piantek, Mr. Graves simply effectuated Defendant's policies as expressed in the

CSI playbook and other guidelines and carried out the day-to-day function of entering data into computer programs and renewing Defendant's customers' insurance policies. *See also Smith v. Frac Tech Services, LLC*, 2011 WL 96868 at *23 (E.D. Ark. Jan. 11, 2011) ("Here, field engineers are directly involved in producing the good or service that is Frac Tech's **primary output**—well stimulation by means of hydraulic fracturing—rather than general administrative work applicable to the running of any business.") (emphasis added).

Mr. Graves does not deny that he had some flexibility in quoting premium prices to the insureds. However, all of this flexibility was within the limits as defined in Defendant's guidelines for underwriters (*see, e.g.*, Exhibit 9 (Profitability Indicator); Exhibit 10 (Authority Grid)). Further, Mr. Graves testified that his flexibility on quote pricing was limited to a 10% reduction from the prior year's premium.

Thus, the undisputed evidence shows that Mr. Graves was a production employee, just as the plaintiffs in *Davis* were production employees. His work was entirely focused on producing renewed policies, that is, Defendant's "marketplace offering." *Bothell, supra*, 299 F.3d at 1127. He had no role whatsoever in running Defendant's business. For this reason, Mr. Graves's instant Motion should be granted.

### B.  Defendant's Actions Were Willful

Finally, the Court should enter judgment that Defendant's actions were willful, so that the period of Mr. Graves' recovery extends from April 17, 2009 through December 1, 2010.

Defendant took no steps whatsoever to determine whether or not it was in compliance with the FLSA when Mr. Graves was converted from a non-exempt to an exempt employee. Rather, although it had a process in place to review the propriety of an exemption decision, it simply ignored the position of Underwriter I. As Lee Ann Siana testified, no one ever

complained, and the General Counsel's office never asked her to perform a review, so no review was ever done.

Defendant's entire defense on the issue of willfulness can be summed up as "we did a review in the past, no one ever complained, so we just did nothing."  This sort of conscious disregard for the consequences of its decision to convert Mr. Graves from non-exempt to exempt is precisely the sort of conscious disregard that constitutes willfulness under the statute. Defendant's actions were willful, and the Court should enter judgment accordingly.

### C.  Plaintiff has Established Unliquidated Damages in the Amount of $14,022.29

The undisputed evidence shows that, between April, 2009 and March 31, 2010, Mr. Graves was earning $1,900.36 semi-monthly.  (Testimony of Garrett Graves; Exhibit 22). Effective April 1, 2010, he received a raise to $1,957.29 semi-monthly. (Testimony of Garrett Graves; Exhibit 22).  He also testified that he worked 165 hours of overtime while in Connecticut, (140 hours before April 1, 2010) and 253 hours of overtime while in California.

Before April 1, 2010, Mr. Graves' semi-monthly salary converts to $877.09 per week ($1900.36 x 24 = $45,608.84, divided by 52 = $877.09).  This converts to a regular hourly rate of $21.93 per hour, and an overtime rate of $32.89 per hour.  $32.89 times 140 hours equals $4,604.72 for the time period between April 17, 2009 and March 31, 2010.

After March 31, 2010, Mr. Graves' semi-monthly salary was $1,957.29, which converts to $903.36 per week ($1,957.29 x 24 = $46,974.96, divided by 52 = $903.36).  This converts to a regular hourly rate of $22.58 per hour, and an overtime rate of $33.87 per hour.  $33.87 times 278 hours equals $9,417.57 for the period between April 1, 2010 and December 1, 2010.

Thus, Mr. Graves' total, unliquidated damages are $14,022.29 ($4,604.72 + $9,417.57 = $14,022.29).  As the Court already has determined that Mr. Graves is entitled to

liquidated damages, the Court should enter judgment in his favor for $14,022.29 plus an additional $14,022.29 in liquidated damages.

**V.      Conclusion**

Mr. Graves simply did not carry out the type of work that federal and state laws characterize as "administrative."  He implemented Defendant's policies, he did not create or participate in any way in the formulation of these policies.  He did not carry out any functions that are generally carried out at any business, such as computing Defendant's taxation, administering its human resources or benefits, procuring insurance or supplies, etc.  These are the fungible functions that demonstrate that an employee is truly an administrative employee.  In contrast, Mr. Graves applied the rules formulated by Defendant over and over in his role as a renewal underwriter. Defendant's actions were willful, in that it never considered the propriety of its exemption classification.

For the foregoing reasons, Mr. Graves's Motion for Judgment as a Matter of Law should be granted.

Plaintiff, GARRETT GRAVES


By:      _/s/ **Richard E. Hayber**
          Richard E. Hayber
          Fed Bar No.: CT11629
          The Hayber Law Firm, LLC
          221 Main Street, Suite 502
          Hartford, CT 06106
          Phone: (860) 522-8888
          Fax:    (860) 218-9555
          rhayber@hayberlawfirm.com
          Attorney for the Plaintiffs

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 14, 2015, a copy of the above was hand-filed with the court and a copy was hand delivered to the following counsel of record:

> Victoria Woodin Chavey
> David Golder
> Jackson Lewis PC
> 90 State House Square
> Hartford, CT 06103

<u>    /s/*Richard E. Hayber*       </u>
Richard E. Hayber

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on **May 14, 2015** a copy of the foregoing was filed electronically [and service made by mail to anyone unable to accept electronic filing].  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system [or by mail for anyone unable to accept electronic filing].  Parties may access this filing through the Court's CM/ECF system.

*<u>/s/ Richard E. Hayber                </u>*
Richard E. Hayber